In the Supreme Court of Georgia

Decided: September 22, 2014

S14A0988. MOORE v. THE STATE.

HUNSTEIN, Justice.

Appellant Patrick Ramon Moore was convicted by a jury of murder and related offenses for the January 3, 2011 shootings of Erica Peterson, Fabian Ellis, and Jervod Jarvis, and shooting death of Tracy Burton. Appellant appeals the denial of his amended motion for new trial, contending that the evidence was insufficient for a jury to find him guilty, and also asserting that the trial court erred by (1) excluding evidence of a victim's possession of drugs, (2) admitting evidence concerning Appellant's Facebook page, and (3) refusing to give a voluntary manslaughter jury charge. Finding no error, we affirm.[1]

---

[1] On December 11, 2011, a Clayton County grand jury indicted Appellant for malice murder, two counts of felony murder, four counts of aggravated assault, two counts of aggravated battery, four counts of possession of a weapon during the commission of a crime, theft by receiving stolen property, and possession of a firearm by a convicted felon. During September 17-21, 2012, Appellant was tried before a jury. On September 21, 2012, the jury returned a verdict of guilty on all counts except one count of felony murder and possession of a firearm by a convicted felon, both of which had been severed prior to trial and were nolle prossed. On the same

Viewed in the light most favorable to the jury's verdict, the evidence adduced at trial established as follows. On January 3, 2011, Appellant and his girlfriend, Toni Hale, returned to their apartment to find the door open and that they had been burglarized. Hale and Appellant suspected that Erica Peterson, Fabian Ellis, Jervod Jarvis, and Tracy Burton had burglarized their apartment.

Later that evening, Peterson, Burton, Jarvis, and Ellis approached Appellant, who was standing in a darkened area of the apartment complex. Jarvis attempted to speak with Appellant about the theft. Appellant pulled an AK-47 from under his jacket and began firing. All of the victims were unarmed and ran. Appellant shot Burton twice from behind, and he died instantly from a gunshot wound to the back of his head. Appellant struck Jarvis in the back,

---

day, the court sentenced Appellant to life imprisonment without the possibility of parole for malice murder; a concurrent 20-year term for one count of aggravated assault and two counts of aggravated battery; a concurrent 10-year term for theft by receiving stolen property; and a consecutive five-year term for each count of possession of a weapon during the commission of a crime to run concurrently with each other. The remaining counts merged or were vacated as a matter of law. Appellant filed a motion for new trial on September 26, 2012, which was amended on August 16, 2013. In lieu of an evidentiary hearing, the parties agreed to submit arguments by brief. The trial court denied Appellant's motion for new trial as amended on November 4, 2013. Appellant filed a notice of appeal on November 14, 2013. The appeal was docketed to the April 2014 term of this Court and submitted for a decision on the briefs.

with a bullet exiting his chest and exposing his right lung. Jarvis initially fell down but then was able to get up and keep running. A bullet hit Peterson's phone, which was in her pocket. Appellant shot Ellis in the hand, and he collapsed and pretended to be dead. Appellant continued to fire the gun as he pursued Jarvis and Peterson around the corner of an apartment building in the complex. Appellant then fled into one of the apartment buildings. Meanwhile, Ellis got up, ran to Peterson and Jarvis, and called 911.

Appellant left the AK-47 at Jessica Pettis' apartment and fled the apartment complex. Appellant later called Pettis and told her to put the gun away and that "he tried to shoot them all in their head. But the girl had ran [sic]." Pettis hid the AK-47 in a closet. Later that evening, at the direction of police, Pettis called Appellant, placed the call on speaker phone, and Appellant again told Pettis to put the gun away. Pettis then disclosed to police where she had hidden the AK-47. After police left, Pettis called Appellant and told him that they had found the gun, to which Appellant responded, "F***, they got me then."

Peterson, Jarvis, and Ellis, as well as a maintenance worker for the apartment complex identified Appellant as the shooter in a photographic lineup

and also at trial. The maintenance worker also testified that he saw Appellant raise his weapon and start firing at the four victims and that Appellant was the only person with a gun.

At trial, a detective testified that the path of the bullet wound that killed Burton was consistent with him running away from the bullet. The investigator testified further that the first cluster of shell casings recovered at the scene was consistent with someone standing in one place and firing in the direction of where Burton's body was found, and the second cluster of shell casings was consistent with someone advancing while continuing to fire. A firearms examiner testified at trial that the shell casings found at the scene had been fired from the AK-47 found at Pettis' apartment. The owner of the AK-47 identified the serial number on the AK-47 found in Pettis' apartment as the same one that had been stolen from his home in December 2010.

Additionally at trial, a copy of Appellant's Facebook page was admitted into evidence over Appellant's objection. Hale read several of Appellant's Facebook posts into evidence, including the following from December 30, 2011:

> Man, this some sh [sic] I got to be behind the walls instead of being behind my chick come 2012. Next time lames run in da [sic] spot, ima [sic] b**** up and call the law. Maybe den [sic] I'll stay on the

4

streets. Happy New Years. The resolution is not to scratch my trigger finger so often.

1. Appellant argues that the evidence was insufficient to convict him and that he was legally justified in firing his weapon in self-defense. He contends that the four victims approached him in the dark and he believed they would harm him, just as they had burglarized his apartment earlier that day. Appellant asserts further that a clip loaded with bullets for a 9 millimeter handgun was found in Ellis' pocket and that Ellis told the 911 dispatcher that he "should (or could) have shot him," which confirms that Ellis brandished his weapon at Appellant.

We find that the evidence was sufficient to enable a rational trier of fact to conclude beyond a reasonable doubt that Appellant was guilty of the crimes of which he was convicted. Jackson v. Virginia, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979). The court charged the jury on self-defense and justification, and it was within the province of the jury to assess the evidence and determine whether Appellant acted in self-defense. See White v. State, 287 Ga. 713, 715 (1) (b) (699 SE2d 291) (2010) ("the issues of witness credibility and justification are for the jury to decide, and the jury is free to reject a

defendant's claim that he acted in self-defense"). Four eyewitnesses testified that Appellant fired at the victims unprovoked, and the only weapon recovered from the crime scene was Appellant's AK-47. No evidence was presented at trial to suggest that any of the victims was armed. The 9 millimeter clip found in Ellis' pocket was not missing any bullets, nor did it show any evidence of having been used in conjunction with firing a weapon. Finally, statements Appellant made after the shooting did not support a theory of self-defense and instead indicated that Appellant was excited, was hoping for news coverage of the shooting, and shot the victims "to show people that he was nothing to play with." See Vega v. State, 285 Ga. 32, 33 (1) (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'") (citation omitted).

2. Appellant argues that the trial court erred by excluding evidence that Burton was in possession of drugs at the time of the shooting. Appellant asserts that this evidence was relevant to support his theory that he was acting in self-defense and feared bodily harm from Burton, who was under the influence of drugs, and his contention that the victims were armed because they were involved with the distribution of drugs.

6

We review the admission of evidence for an abuse of discretion. Burgess

v. State, 292 Ga. 821 (4) (742 SE2d 464) (2013).

> Generally, a murder victim's character is irrelevant and, thus, inadmissible. Evidence that impugns a victim's character cannot be admitted unless it has some factual nexus with the conclusion for which it is being offered. Sheer speculation is insufficient. Otherwise, character evidence would be admitted routinely, disguised as relevant to whatever speculative theory the proponent managed to put forth.

Roseberry v. State, 274 Ga. 301, 303 (2) (553 SE2d 589) (2001).

There is no evidence of any connection between Burton's purported drug use or alleged involvement in drug distribution and Appellant's shooting of Burton in his back and the back of his head. Because there is only sheer speculation by Appellant of any factual nexus, the trial court did not abuse its discretion in excluding evidence of any drugs found in Burton's pocket. See McBride v. State, 291 Ga. 593 (3) (732 SE2d 757) (2012) (trial court did not abuse discretion in excluding evidence showing that the victim may have used drugs or been involved in the distribution of drugs prior to the defendant's shooting of him because there was no connection between the victim's alleged drug use or sale and the defendant's shooting of the victim from behind).

3. Appellant next asserts that the trial court erred in permitting testimony

7

from Hale about a Facebook page in Appellant's name. First, Appellant contends that the Facebook page was not properly authenticated and there was insufficient evidence to prove that Appellant actually made the comments on the page. Appellant asserts that Hale was not present when the comments were made, and she admitted that anyone could have posted the comments and created the Facebook page.

"Documents from electronic sources such as the printouts from a website like [Facebook] are subject to the same rules of authentication as other more traditional documentary evidence and may be authenticated through circumstantial evidence." Burgess, 292 Ga. at 823.[2]

Hale testified that the picture on the Facebook page was of Appellant and confirmed that his hometown was Gary, Indiana, as listed on the page. The Facebook page included the cell phone number from which Appellant had called Hale. Hale and other witnesses testified that Appellant went by the nickname "Crown" or "Crown Hood," and the Facebook page profile name was listed as "Patrick Crown Hood Moore." Appellant's Facebook page contained details

_____

[2]This case was tried before January 1, 2013, which was the effective date of Georgia's new Evidence Code, including OCGA § 24-9-901 ("Requirement of authentication or identification").

about his life that were not public knowledge and made references to Appellant's other girlfriend and his brothers. Hale also testified that the structure and style of the comments posted on the page matched the structure and style of the texts Appellant had sent Hale. Finally, Appellant admitted to Hale that the Facebook page belonged to him. Based on this direct and circumstantial evidence, we find that the Facebook page was properly authenticated. See id. at 823-24 (printout from a MySpace profile page was sufficiently authenticated by testimony that the defendant's nickname matched the profile name, photos of the defendant matched the images on the printout, and the defendant's age and hometown were accurately listed on the page); In re L.P., 324 Ga. App. 78 (2) (749 SE2d 389) (2013) (Facebook page sufficiently authenticated by photos of the defendant and the defendant's biographical information).

Second, Appellant contends that Hale's testimony about Appellant's Facebook page improperly placed Appellant's character in evidence. Hale testified that Appellant told her he had a cell phone while he was in jail, and she explained that the Facebook posts indicated that Appellant made them from a cell phone rather than a computer. Hale also testified that when Appellant made these posts to Facebook, Appellant was in prison and not in jail. Appellant

contends that Hale's testimony improperly placed his character in evidence because (1) the jury could infer that Appellant had illegally smuggled a cell phone into custody; and (2) Hale stated that Appellant was in both the county jail and state prison. Appellant argues that this testimony was a direct comment on his character, irrelevant, and prejudicial.

At trial, although Appellant objected to the introduction of Appellant's Facebook page based on a lack of authentication, Appellant did not object to Hale's testimony based on improper character evidence. "Georgia 'has long followed the contemporaneous objection rule, which provides that counsel must make a proper objection on the record at the earliest possible time to preserve for review the point of error.'" Johnson v. State, 292 Ga. 785, 787 (3) (741 SE2d 627) (2013). In the absence of a contemporaneous objection and ruling thereon at trial, this issue was not properly preserved for appeal. See id.

Even if Appellant had made a timely objection, we find no error.

Evidence which is relevant and responsive but which minimally places the character of the defendant into issue, is nevertheless admissible where the relevance of the testimony outweighs any prejudice it may cause. Relevant evidence is not rendered inadmissible because it incidentally puts the defendant's character into issue.

Roebuck v. State, 277 Ga. 200, 205 (5) (586 SE2d 651) (2003) (citations and punctuation omitted). Additionally, a "passing reference to a defendant's record does not put his character into issue." Id.

Here, the focus of Hale's testimony was not on Appellant's character and that he was in prison, but on whether he was making posts to Facebook. Such a passing reference to Appellant being in prison does not render the evidence inadmissible. See id. Additionally, there was no evidence presented to the jury to indicate that Appellant's possession of a cell phone while in custody was a crime or that he had illegally smuggled a phone into custody. Furthermore, Hale's testimony about Appellant having a cell phone while in custody was relevant to verify the phone number Appellant listed on his Facebook page and to show that he was posting to Facebook via a cell phone. Hale's testimony was also relevant to show that Appellant, as opposed to a third person, made the Facebook posts because the posts referenced him being in custody. Finally, the Facebook posts were relevant because they were evidence from which a jury could infer Appellant's guilt. The relevance of this evidence outweighs any prejudice.

4. Appellant argues that the trial court erred by refusing to charge the jury

on voluntary manslaughter. "A trial court is required to give a requested charge on voluntary manslaughter if there is slight evidence showing that the victim seriously provoked the defendant, causing the defendant to kill the victim solely as the result of a sudden, violent, and irresistible passion, OCGA § 16-5-2(a)." Merritt v. State, 292 Ga. 327, 331 (2) (737 SE2d 673) (2013) (punctuation omitted).

There is no evidence that Appellant killed Burton solely as a result of a sudden, violent, and irresistible passion. Jarvis, Peterson, and Ellis each consistently testified that they did not provoke Appellant and that Appellant did not say anything to them before he pulled out the AK-47 and began firing at them. Furthermore, Jarvis and Peterson testified that after they approached Appellant, Jarvis asked Appellant "what was going on," to which Appellant never replied and instead began firing. This evidence, showing that the victims did not seriously provoke Appellant, and that instead he shot unarmed victims from behind and continued to pursue them as they tried to flee from him, did not warrant a voluntary manslaughter charge. See Hicks v. State, 287 Ga. 260 (3) (695 SE2d 195) (2010) (no voluntary manslaughter charge required where the defendant assaulted the victim with a deadly weapon and then fired fatal shots

12

into his back as he attempted to flee).

In addition to the victims' testimony, the maintenance worker testified that he heard Appellant screaming and cursing just before the shots were fired. Yet, "fighting prior to a homicide 'does not constitute the type of provocation that would warrant a charge of voluntary manslaughter.'" Nichols v. State, 275 Ga. 246, 246-47 (2) (563 SE2d 121) (2002); see Merritt, 292 Ga. at 331 (2013) ("'words alone [generally] are not sufficient provocation to excite the passion necessary to give rise to voluntary manslaughter'"). Furthermore, Appellant's alleged fear that the victims might pull a gun on him was insufficient provocation to warrant a voluntary manslaughter charge. See Funes v. State, 289 Ga. 793, 795 (2) (716 SE2d 183) (2011) ("fear that someone is going to pull a gun" is not a type of provocation demanding a voluntary manslaughter charge). Accordingly, the trial court did not err by refusing to charge the jury on voluntary manslaughter.

Judgment affirmed. All the Justices concur.

13